N/S

010194

**FILED**
CLERK, U.S. DISTRICT COURT

9/9/20

CENTRAL DISTRICT OF CALIFORNIA
BY: CS DEPUTY

ORIGINAL

FEE PAID

1   Wilmer J. Harris, SBN 150407
    wharris@sshhzlaw.com
2   **SCHONBRUN SEPLOW HARRIS**
    **HOFFMAN & ZELDES LLP**
3   715 Fremont Avenue, Suite A
4   South Pasadena, CA. 91030
    Telephone No.: (626) 441-4129
5   Facsimile No.: (626) 283-5770
6
7   [Additional Counsel on following page]

EDCV20-1906-PA(KKx)

8   Attorneys for Plaintiff/Relator Randy Jacobs

9               UNITED STATES DISTRICT COURT
10
11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12
13  | UNITED STATES OF AMERICA | CIVIL ACTION NO. |
    ex rel. RANDY JACOBS,

14          and                    **COMPLAINT**
15  STATE OF CALIFORNIA ex rel.
    RANDY JACOBS
16                                   1. VIOLATION OF FEDERAL
17          Relator,                   FALSE CLAIMS ACT 31 U.S.C.
                                       § 3729 (a) (1) (A);
18          v.
                                     2. VIOLATION OF FEDERAL
19                                      FALSE CLAIMS ACT 31 U.S.C.
20  PACIFIC DERMATOLOGY                 § 3729 (a) (1) (B);
    INSTITUTE, INC., BRADLEY
21  MUDGE, and KHODADAD              3. VIOLATION OF FEDERAL
    MEHRAIN                             FALSE CLAIMS ACT 31 U.S.C.
22                                      § 3729 (a) (1) (G);
23          Defendants.
                                     4. VIOLATION OF CALIFORNIA
24                                      FALSE CLAIMS ACT CAL.
                                        GOVT. CODE §§ 12651 et seq.
25
26                                   **DEMAND FOR JURY TRIAL**
27
28

COMPLAINT

1  Mike Bothwell (Georgia Bar No. 069920- Pro Hac Vice Application filed
   concurrently)
2  Mike@whistleblowerlaw.com
3  **BOTHWELL LAW GROUP, P.C.**
   304 Macy Drive
4  Roswell, GA 30076
5  Telephone No.: (770) 643-1606
   Facsimile No.: (770) 643-1442
6
7  Attorneys for Plaintiff/Relator Randy Jacobs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1

## **COMPLAINT**

2      The United States of America and the State of California, by and through

3 Relator Randy Jacobs ("Relator"), bring this action under 31 U.S.C. § 3729 *et seq.*

4 (False Claims Act "FCA") and the California False Claims Act, Cal. Govt. Code §

5 12651 *et seq.* to recover all damages, penalties, and other remedies established by

6 the FCA on behalf of the United States and Relator, and the California False Claims

7 Act on behalf of the State of California and Relator, and would show the following:

8                          **JURISDICTION AND VENUE**

9      1.      This action arises under the FCA, 31 U.S.C. § 3729, *et seq.* and the

10 California False Claims Act, Cal. Govt. Code § 12651 *et seq.*

11     2.      This court has personal jurisdiction over the Defendants pursuant to

12 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact

13 business in this jurisdiction, and portions of the violations of the FCA described

14 herein were carried out in this district.

15     3.      This Court has subject-matter jurisdiction over this action pursuant to

16 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

17     4.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and

18 under 31 U.S.C. § 3732(a).

19     5.      Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction

20 over the subject matter of the claim brought pursuant to the California False

21 Claims Act on the ground that the claim is so related to the claims within this

22 Court's original jurisdiction that they form the same case or controversy under

23 Article III of the United States Constitution.

24                                **THE PARTIES**

25     6.      Dr. Randy Jacobs is a board-certified clinical dermatologist with

26 special expertise in skin cancer prevention, skin cancer treatment, acne care,

27 complexion care, and care for all people with dry and sensitive skin conditions.

28 He received a medical degree upon graduating from the University of Southern

1    California School of Medicine, after which he completed a six (6) year medical
2    residency at the Loma Linda University Medical Center.  His six-year residency
3    included two internship years, one in Internal Medicine and one in Pediatrics,
4    plus, four years of post-graduate education in Dermatology. Relator has practiced
5    dermatology for approximately thirty-four (34) years and has been in private
6    practice since 1992.

7          7.     Pacific Dermatology Institute, Inc. ("Pacific Dermatology") has
8    eleven (11) offices in Apple Valley, Chino Hills, Corona, Loma Linda, Murrieta,
9    Palm Springs, Redlands Ford, Redlands Terracina, Riverside, San Bernardino, and
10   Temecula, California.  Pacific Dermatology maintains its corporate office at 101
11   E. Redlands Blvd., Suite 284, Redlands, California 92373.  Pacific Dermatology's
12   filings with the California Secretary of State list its address for service of process
13   as 240 Newport Center Dr., Suite 105, Newport Beach, California 92660. Pacific
14   Dermatology's agent for service of process is Bradley Mudge. Dermatology
15   Institute, Inc.  ("Pacific Dermatology") has offices in Apple Valley, Corona,
16   Loma Linda, Murrieta, Palm Springs, Redlands Terracina, Riverside, San
17   Bernardino, Upland, Temecula, Chino Hills, California with their principal
18   business office at101 E. Redlands Blvd, Suite 284, Redlands, CA 92373.

19         8.     Dr. Bradley Mudge is a Dermatologist at Pacific Dermatology and
20   also listed as a Director of Pacific Dermatology.

21         9.     Dr. Khodadad Mehraein is a pathologist with a primary practice
22   address located at 1415 E 17th Street, Suite 280, Santa Ana, California 92705.

23                **HEALTHCARE PROGRAMS AND LAWS**
24   **A.  Medicare and Medicaid Programs**
25         10.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*,
26   establishes the Health Insurance for the Aged and Disabled Program, popularly
27   known as the Medicare program. The Secretary of the United States Department
28   of Health and Human Services ("HHS") administers the Medicare Program

1  through the Centers for Medicare and Medicaid Services ("CMS"), a component
2  of HHS.

3      11.    The Medicare program consists of several parts.  Medicare Part A
4  provides basic insurance for the costs of hospitalization and post-hospitalization
5  care. 42 U.S.C. § 1395c-1395i-2 (1992).  Medicare Part B is a federally
6  subsidized, voluntary insurance program that covers certain non-hospital medical
7  services and products including the treatments at issue in this complaint. 42
8  U.S.C. § 1395(k), 1395(i), 1395(s). Reimbursement for Medicare claims is made
9  by the United States through CMS.  CMS, in turn, contracts with private insurance
10  carriers to administer and pay Medicare Part B claims from the Medicare Trust
11  Fund.  42 U.S.C. § 1395(u).  In this capacity, the carriers act on behalf of CMS.
12  42 C.F.R. § 421.5(b) (1994).

13      12.    In order to receive Medicare funds, enrolled suppliers, including
14  Defendants, together with their authorized agents, employees, and contractors, are
15  required to abide by all the provisions of the Social Security Act, the regulations
16  promulgated under the Act, and all applicable policies and procedures issued by
17  the states that expressly state that a provider must certify that it is in compliance
18  with all federal and state statutes and regulations in order to receive payment from
19  Medicare and/or Medicaid.  42 C.F.R. § 455, *et seq*.

20      13.    Among the rules and regulations which enrolled suppliers, including
21  Defendants, agree to follow are to: (1) bill Medicare for only those covered
22  services which are medically necessary; (2) not bill Medicare for any services or
23  items which were not performed or delivered in accordance with all applicable
24  policies, nor submit false or inaccurate information relating to provider costs or
25  services; (3) not engage in any act or omission that constitutes or results in over-
26  utilization of services; (4) be fully licensed and/or certified under the applicable
27  state and federal laws to perform the services provided to recipients; (5) comply
28  with state and federal statutes, policies and regulations applicable to Medicare;

1   and (6) not engage in any illegal activities related to the furnishing of services to
2   recipients.
3       14.    Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*,
4   establishes Medicaid, a federally assisted grant program for the States.  Medicaid
5   enables the States to provide medical assistance and related services to needy
6   individuals.  CMS administers Medicaid on the federal level.  Within broad
7   federal rules, however, each state decides who is eligible for Medicaid, the
8   services covered, payment levels for services and administrative and operational
9   procedures.  Medicaid authorizes grants to states for medical assistance to
10  children and blind, aged, and disabled individuals whose income and resources
11  are not sufficient to meet the costs of necessary medical care. 42 U.S.C. § 1396;
12  42 C.F.R. § 430.0; 42 U.S.C. § 1396-1396v.  The Medicaid Program is jointly
13  funded by the federal government and participating states.
14      15.    In California, the Medicaid Program is called "Medi-Cal" and is
15  administered by the California Department of Health Care Services ("DHCS")
16  and CDPH. The CMS Medicare regulations at 42 C.F.R. § 409 *et seq.* apply to
17  beneficiaries of both Medicare and Medi-Cal ("dual eligibles")
18      16.    At all times relevant to this Complaint, the United States provided
19  funds to the States through the Medicaid program.  Enrolled providers of medical
20  services to Medicaid recipients are eligible for payment for covered medical
21  services under the provisions of Title XIX of the 1965 Amendments to the Federal
22  Social Security Act.  By becoming a participating provider in Medicaid, enrolled
23  providers agree to abide by the rules, regulations, policies and procedures
24  governing claims for payment, and to keep and allow access to records and
25  information as required by Medicaid.  In order to receive Medicaid funds, enrolled
26  providers, together with authorized agents, employees, and contractors, are
27  required to abide by all the provisions of the Social Security Act, the regulations
28  promulgated under the Act, and all applicable policies and procedures issued by

1 | the State.

2 |     17.    As a condition of participation in the Medicare and Medicaid

3 | programs, providers are required to enter into "Provider Agreements" with the

4 | government. 42 U.S.C. § 1395cc. At all times relevant herein, the Medicare

5 | Provider Agreement, Form CMS-1561 (07/01), contained the following

6 | certification: "In order to receive payment under title XVIII of the Social Security

7 | Act, [provider name] as the provider of services, agrees to conform to the

8 | provisions of 1866 of the Social Security Act and applicable provisions in 42

9 | CFR." The provider must also certify that it can be subject to criminal penalties if

10 | it "knowingly and willfully falsifies" a material fact, or makes any "false,

11 | fictitious or fraudulent statement or representation."

12 |     18.    Pacific Dermatology, as "Provider," executed a Medi-Cal

13 | Telecommunications Provider and Biller Application/Agreement (Form 6153)

14 | with DHCS. Form 6153 required the provider to certify under penalty of perjury

15 | that (1) "all claims for services submitted electronically have been personally

16 | provided to the patient;" (2) "[t]he services were medically indicated and

17 | necessary to the health of the patient;" and (3) "all information submitted

18 | electronically is accurate and complete." By signing Form 6153, the Provider (1)

19 | "understands that payment of [Medi-Cal] claims will be from federal and/or state

20 | funds, and that any falsification or concealment of a material fact may be

21 | prosecuted under federal and/or state laws"; (2) "agrees to retain personal

22 | responsibility for the development, transcription, data entry, and transmittal of all

23 | claim information for payment"; and (3) "assume[s] personal responsibility for

24 | verification of submitted claims with source documents."

25 |     19.    The Medi-Cal Provider Agreement (Form DHCS 9098 (6/10)),

26 | similarly required the provider to agree to "comply with all federal laws

27 | governing and regulating Medicaid providers," and that "it may be subject to

28 | temporary suspension" if it is under investigation for fraud or abuse of the Medi-

1 | Cal program "or other health care programs operated, or financed in whole or in
2 | part, by the Federal Government."

3      20.    As a final condition of participation and payment, Medicare
4 | providers must execute a Medicare Electronic Data Interchange ("EDI")
5 | Enrollment Form in order to submit claims electronically.  The EDI Form requires
6 | providers to agree to "be responsible for all Medicare claims submitted to CMS
7 | by itself, its employees, or its agents," and to "submit claims that are accurate,
8 | complete and truthful." By executing the EDI Enrollment Form, a provider
9 | acknowledges that "all claims will be paid from Federal funds, that the
10 | submission of such claims is a claim for payment under the Medicare program,
11 | and that anyone who misrepresents or falsifies or causes to be misrepresented or
12 | falsified any record or other information relating to that claim as required by this
13 | Agreement may, upon conviction be subject to a fine and/or imprisonment under
14 | applicable Federal law."

15      21.    At all times relevant to this Complaint, Defendants were participating
16 | as Medicare/Medicaid providers.

17      22.    At all times relevant to this Complaint, Medicare/Medicaid
18 | constituted and continues to constitute a significant source of revenue for
19 | Defendants.

20      23.    Defendants submitted or caused to be submitted false claims for
21 | payment to Medicare/Medicaid for services and supplies.

22 | **B.  General Rules for Billing Physician Services**

23      24.    Under Medicare rules, physician services are reimbursed through a
24 | payment system called the Resource Based Relative Value Scale ("RBRVS"). In
25 | the RBRVS system, payments for medical services and procedures are determined
26 | by the resource costs needed to provide them.  Payments are calculated by
27 | multiplying a standardized measure of the amount of resources the service or
28 | procedure is expected to require by a region-specific payment rate (conversion

1    factor).

2         25.    RBRVS payments are based on the Healthcare Common Procedure

3    Coding System ("HCPCS").  HCPCS is a standardized coding system designed to

4    ensure that Medicare, Medicaid and other federal and state-funded health care

5    programs pay for services rendered to patients by physicians and other healthcare

6    professionals in accordance with payment schedules tied to the level of

7    professional effort required to render classes or types of medical care. To ensure

8    uniform descriptions of medical care rendered and consistent compensation for

9    similar work, Government-funded health care programs tie levels of

10   reimbursement to these standardized codes.

11        26.    The Current Procedural Terminology ("CPT") codes are a subset of

12   the HCPCS codes (called Level I codes) and are published and updated annually

13   by the American Medical Association.  Base CPT codes are five-digit numbers

14   organized in numeric sequences that identify both the general area of medicine to

15   which a procedure relates (such as "Evaluation and Management," "Surgery," or

16   general "Medicine") and the medical services and procedures commonly

17   performed by physicians working in that field.

18        27.    Physicians typically submit claims to Medicare and Medicaid for

19   professional services on Form CMS-1500.  The claim form sets forth the

20   diagnostic code describing the patient's presenting condition and the procedural

21   codes.  On the claim form, the physician certifies that the services were

22   "medically indicated and necessary to the health of the patient...."

23        28.    Medicare will only pay for services that are "reasonable and

24   necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. §

25   1395(a)(l)(A).

26        29.    The medical necessity requirement applies not only to the fact of

27   treatment, but also to the level of treatment provided to the patient. Medicare will

28   not pay for more expensive services if only less expensive services were

1    medically necessary.  For physician services, "medical necessity of a service is the
2    overarching criterion" for determining which CPT code is appropriate.  *See*
3    Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A).

4         30.    Although CPT codes are used by Medicare to determine the
5    appropriate levels of reimbursement for specific medical procedures and services,
6    those codes are not intended to substitute for adequate documentation in a
7    patient's medical record of all medical services rendered.  In part to establish that
8    care was appropriately rendered and medically necessary, patient medical records
9    must also document the reason for the patient encounter and relevant history,
10   physician examination findings and prior diagnostic test results; assessment,
11   clinical impression or diagnosis; plan for care; time and date; and legible identity
12   of the provider.  The patient's progress, response to and changes in treatment, and
13   revision of diagnosis should also be documented.  If not documented, the rationale
14   for ordering diagnostic and other ancillary services should be easily inferred, and
15   past and present diagnoses should be accessible.  The documentation must support
16   the CPT codes reported on the health insurance forms.  *See* CMS's 2010
17   Evaluation and Management Services Guide, at 4.

18   **C.  Other Federal Health Care Programs**

19        31.    The Federal Government administers other health care programs
20   including, but not limited to, TRICARE, CHAMPUS, and the Federal Employee
21   Health Benefit Program.

22        32.    TRICARE, administered by the United States Department of
23   Defense, is a health care program for individuals and dependents affiliated with
24   the armed forces.

25        33.    TRICARE is a government-funded program that provides medical
26   benefits to retired members of the Uniformed Services and to spouses and
27   children of active duty, retired, and deceased members, as well as reservists who
28   were ordered to active duty for thirty (30) days or longer.  The program is

1  administered by the Department of Defense and funded by the federal
2  government.

3       34.    CHAMPUS, administered by the United States Department of
4  Veterans Affairs, is a health care program for the families of veterans with 100
5  percent service-connected disability.

6       35.    The Federal Employee Health Benefit Program, administered by the
7  United States Office of Personnel Management, provides health insurance for
8  federal employees, retirees, and survivors.

9  **D. The Federal Anti-Kickback Statute**

10       36.    The Medicare and Medicaid Fraud and Abuse Statute (Anti-
11  Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social
12  Security Act in 1977.  The Anti-Kickback Statute arose out of Congressional
13  concern that payoffs to those who can influence health care decisions will result in
14  goods and services being provided that are medically inappropriate, unnecessary,
15  of poor quality, or even handful to a vulnerable patient population.  To protect the
16  integrity of federal health care programs from these difficult to detect harms,
17  Congress enacted a prohibition against the payment of kickbacks in any form,
18  regardless of whether the particular kickback actually gives rise to overutilization
19  or poor quality of care.

20       37.    The Anti-Kickback Statute prohibits any person or entity from
21  making or accepting payment to induce or reward any person for referring,
22  recommending, or arranging for the purchase of any item for which payment may
23  be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).
24  The statute ascribes liability to both sides of an impermissible kickback
25  relationship.

26       38.    Essentially, if just one purpose of the payment was to induce future
27  referrals, the Medicare statute has been violated. This is true even if the doctor
28  performs some medical service for the money. It is not even required that it be the

1   primary purpose—just one purpose of the payment. In other words, a defendant

2   can have 99 lawful reasons to enter a relationship, but if one other reason is to

3   expect referrals, it is illegal.  It is irrelevant if the funds would have been spent

4   anyway or that Medicare funds were not used to make the illegal payment.

5        39.    Claims for reimbursement for services that result from kickbacks are

6   rendered false under the False Claims Act.  42 U.S.C. § l320a-7b(g). It is not just

7   the claims tied to the referring physician, but all claims that in any way relate to

8   the referred patient. This would include medicine, scans and x-rays, and a host of

9   other related charges.

10        40.    The act of referring a patient to a hospital or other provider is not a

11   covered item or service.  Therefore, any payments made to an employee in order

12   to compensate that employee for making referrals are not covered by the

13   employee safe harbor.  This is true even if the majority of an employee's

14   compensation is for the provision of covered services.  As to that portion of the

15   payments that is made to induce referrals and to compensate for an employee's act

16   of referring, the Anti-Kickback Statute is violated.

17        41.    Compliance with the Anti-Kickback Statute is a precondition to

18   participation as a health care provider under the Medicare and Medicaid

19   programs.

20        42.    Either pursuant to provider agreements, claim forms, or other

21   appropriate manner, physicians who participate in a federal health care program

22   generally must certify that they have complied with the applicable federal rules

23   and regulations, including the Anti-Kickback Statute.

24        43.    Violation of the Anti-Kickback Statute subjects the violator to

25   exclusion from participation in federal health care programs, civil monetary

26   penalties, and imprisonment of up to five years per violation. 42 U.S.C. § l320a-

27   7(b)(7), 1320a-7a(a)(7).  Any party convicted under the Anti-Kickback Statute

28   must be excluded (i.e., not allowed to bill for services rendered) from federal

1    health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(l).

2    Even without a conviction, if the Secretary of HHS finds administratively that a

3    provider has violated the statute, the Secretary may exclude that provider from the

4    federal health care programs for a discretionary period (in which event the

5    Secretary must direct the relevant State agencies to exclude that provider from the

6    State health program), and may consider imposing administrative sanctions of

7    $50,000 per kickback violation.  42 U.S.C. § l320a-7(b).

8         44.    The Patient Protection and Affordable Care Act, Pub. L. No. 111-

9    148, § 6402(f)(2), 124 Stat. 119, 759 (March 23, 2010), clarified that "a person

10   need not have actual knowledge of" or "specific intent to commit a violation" of

11   the Anti-Kickback Statute.

12        45.    The enactment of these various provisions and amendments

13   demonstrates Congress' commitment to the fundamental principle that federal

14   health care programs will not tolerate the payment of kickbacks. Thus,

15   compliance with the Stark and Anti-Kickback Statutes is a prerequisite to a

16   provider's right to receive or retain reimbursement payments from Medicare,

17   Medicaid and other federal health care programs.

18        46.    The Anti-Kickback Statute (AKS) specifies that "a claim that items

19   or services resulting from a violation of this section constitutes a false or

20   fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b (2013).

21   Accordingly, receiving kickbacks disqualifies all remuneration from Government

22   Payors.

23                          **FACTUAL ALLEGATIONS**

24   **A.   MOHS SURGERY**

25        47.    Mohs micrographic surgery (aka "Mohs surgery") is a specialized

26   technique for the removal of skin cancer, and is reserved for particular types of

27   skin cancers, including skin cancers that have recurred following  previous

28   treatment, cancers that are at high risk of recurrence, cancers located in specific

1    areas of the body, large tumors, and neurotropic lesions. It is most commonly used
2    to remove basal cell carcinoma ("BCC") and, much less frequently, squamous cell
3    carcinoma ("SCC").

4        48.    BCC and SCC are both types of non-melanoma skin cancer
5    ("NMSC"). NMSCs most frequently occur on the head and neck.

6        49.    The surgical procedure has also been used to remove melanoma and
7    other malignancies of the skin and mucous membranes.  Mohs surgery is a tissue-
8    sparing procedure, with the objective of fully removing the cancer with as little
9    loss of skin as possible.  Thus, it may allow a more cosmetically aesthetic or
10   functional post-surgical result, in specific areas, than other treatment modalities.

11       50.    Historically, Mohs surgery is often performed by dermatologists
12   because of their expertise in skin cancer pathophysiology, cutaneous
13   histopathology, and dermatologic surgery, including their ability to repair defects.
14   ("Defect" means the surgical wound created by the removal of the specimen.)

15       51.    Training programs in Mohs surgery are available throughout the U.S.
16   via a one (1) or two (2)-year post-residency fellowship.  In 2003, the
17   Accreditation Council for Graduate Medical Education approved procedural
18   dermatology fellowships in which Mohs surgery is often the fellowships'
19   centerpiece.

20       52.    Mohs surgery is usually performed in a medical office properly
21   equipped for the procedure. (It need not be performed in a specialized outpatient
22   surgical facility.) The procedure may take several hours, depending on the extent
23   of the cancer. If facial reconstruction is needed (e.g., a flap) after the Mohs
24   surgery, a lot of additional time is needed.

25       53.    Mohs surgery is a meticulous technique that provides complete
26   microscopic margin control through the taking of horizontal frozen histological
27   sections of the surgical margins of the excised tumor, for the most complete
28   microscopic examination possible. It requires a physician trained in Mohs surgery

1  and pathology to accurately excise and map tumor extensions.

2      54.   The surgery is performed in stages (or "levels") in which the

3  physician removes a single layer of tissue, and performs additional stages, if

4  necessary, for each stage, to clear the area of cancer. (A "stage" or "level", in

5  Mohs surgery, is an individual excision in which tissue is removed from the

6  patient, oriented, processed, and microscopically reviewed.)

7      55.   After each stage of Mohs surgery, the physician examines the excised

8  skin with a microscope for the presence of cancer, acting in a dual role as surgeon

9  and pathologist.  Only if cancer remains present should the physician proceed to

10 the next stage of removing additional tissue.

11     56.   The goal of Mohs surgery is excision of cutaneous and mucosal

12 malignancies with maximal cure rates and tissue sparing.

13     57.   Mohs surgery is not the only way of treating skin cancer and other

14 cutaneous tumors, which may be treated successfully by standard fusiform

15 excision, cryotherapy, radiation therapy, curettage and electrodessication,

16 intralesional interferon, topical and intralesional 5-fluorouracil, and ablative laser

17 treatment. These alternative methods can provide excellent results.

18     58.   Mohs surgery is indicated in situations where other treatment

19 modalities have failed.  The Mohs technique is used for recurrent tumors or those

20 at high risk for recurrence, those with clinically indistinct margins, and for those

21 tumors that are anatomically located where tissue conservation is important.  Such

22 locations include the eyelids, ears, nose, lips, and fingers.

23     59.   Because Mohs surgery is not the exclusive way to treat skin cancer,

24 under Medicare regulations, Mohs surgery is deemed medically reasonable and

25 necessary only if performed based on certain current, accepted diagnoses, and

26 indications.  Medicare separately reimburses for each stage of Mohs surgery

27 performed in removing cancer.  Hence, the more stages of Mohs surgery that are

28 performed, the higher the reimbursement from Medicare.

60.     Although Mohs surgery is not a high-risk form of surgery, it is not without its significant risks. Caution must be taken to ensure that the vital dyes are pure and sterile, to minimize the risk of placing infected material into the surgical site. Mohs surgery frequently may involve the nasal, buccal, conjunctiva, and anogenital mucosa. Proper stabilization, exposure, and instrumentation are essential when working on nasal or oral mucosa to ensure access and hemostasis, and thereby prevent uncontrollable bleeding and aspiration of blood. Further, muscle is commonly encountered during Mohs surgery. Facial muscle lies just below the dermis, often separated by a thin band of connective tissue and little or no fat. Conservation of function is important for muscle groups. To minimize unnecessary muscle damage, the Mohs surgeon must attempt to split muscles and take only superficial portions for evaluation.

61.     Similarly, nerve tissue is commonly encountered during Mohs surgery. Sacrifice of motor nerves can be debilitating, disfiguring, and distressing. Care must be taken to protect named nerves-although these may have to be removed if there is tumor involvement.

62.     As with other forms of surgery, anesthesia poses its own set of risks. Mohs surgery may require several hours to complete; injecting a mixture of short- and long-acting local anesthetics, such as lidocaine and bupivacaine, imparts more prolonged anesthesia and enhances patient comfort. To further reduce intraoperative pain, some surgeons apply lidocaine jelly for EMLA topical anesthetic on the wound between stages. Cutaneous and mucosal Mohs surgery is usually performed under local anesthesia, using a combination of direct infiltration and regional nerve blocks. Lingual, laryngotracheal, esophageal, and anogenital surgery may require conscious sedation or general anesthesia.

63.     Mohs surgery may also leave a scar. In many cases, however, there is little or no scarring.

64.     To bill and receive reimbursement from federal healthcare programs

1   for Mohs-surgical services, the surgeon must perform both the excision and the

2   histologic evaluation.  In such cases, the surgeon would file a claim using Mohs-

3   specific Current Procedural Terminology (CPT) codes:  CPT 17311-17315.  The

4   surgical pathology codes 8830-88309, 88331-88332, and 88342 are part of the

5   Mohs surgery and are bundled into 17311-17315.  The surgeon should not append

6   Modifier 59 to these pathology codes unless they pertain to a separate

7   biopsy/excision that does not involve the Mohs surgery.

8        65.    If either the excision or the histologic evaluation is delegated to

9   another physician who reports the services separately, the Mohs-specific CPT

10  codes should not be reported.  Where the surgeon performs an excision using

11  Mohs surgical techniques but does not personally perform the histologic

12  evaluation, the surgeon must bill for the excision using standard excision codes

13  for any medically necessary services (e.g., CPT 11600 – 11646).

14       66.    Noridian Healthcare Solutions, LLC ("Noridian") has contracted

15  with the Medicare program to administer and pay Medicare Part A and Medicare

16  Part B claims in California.  Pursuant to this role, Noridian has promulgated

17  certain Local Coverage Determinations ("LCD") specifying the conditions

18  necessary to receive reimbursement for Mohs surgeries.  *See* Noridian Healthcare

19  Solutions, Local Coverage Determination (LCD):  Mohs Micrographic Surgery

20  (L3502) (effective date Oct. 1, 2015).  This LCD makes clear that "if either of

21  these responsibilities is delegated to another physician who reports the services

22  separately, [the Mohs-specific codes] should not be reported." *Id.*; *see also*

23  Noridian Healthcare Solutions, Local Coverage Article: Billing and Coding:

24  MOHS Micrographic Surgery (A56514) (effective date January 1, 2018) ("If a

25  surgeon performs an excision using MOHS surgical techniques but does not

26  personally provide the histologic evaluation of the specimen(s), the CPT® codes

27  for MMS shall not be used. Instead standard excision codes should be chosen for

28  such medically necessary services (e.g., 11600 – 11646).").

1    67.    CMS has also promulgated a certain "MLN Matters® Special Edition
2    Article" alerting stakeholders to the impermissibility of billing for Mohs surgeries
3    when the interpretation is performed by someone other than the Mohs surgeon.
4    *See* Ctrs. For Medicare & Medicaid Servs., Guidance to Reduce Mohs Surgery
5    Reimbursement Issues (June 27, 2013) ("You many not bill Medicare for these
6    procedures if preparation or interpretation of pathology slides is performed by a
7    physician other than the Mohs surgeon.").

8    **B.    MOHS SURGERY OBLIGATION FOR ACCURACY**

9    68.    At all relevant times herein, Dr. Bradley Mudge has been a
10   participating physician in the Medicare Part B Program.

11   69.    The vast majority of Dr. Mudge's patients requiring Mohs surgery
12   are over the age of 65 and are Medicare beneficiaries.

13   70.    Medicare local medical review policy requires-among other things-
14   that a physician who claims payment for performing Mohs surgery document in
15   the patient's medical record the necessity of the surgery, include in the medical
16   record a pathologic description of the slides, and retain all slides.

17   71.    Dr. Mudge electronically submitted claims (completed "HCFA
18   1500s") to the Medicare Part B Program.

19   72.    Dr. Mudge agreed in his electronic enrollment form application with
20   Medicare, among other things, that he would be responsible for all Medicare
21   claims submitted to HCFA/CMS relating to Dr. Mudge's services, whether
22   submitted personally by Dr. Mudge, or by his employees or agents, and that he
23   would submit claims that were accurate, truthful and complete, and based on
24   medical services that were reasonable and necessary.

25   73.    However, they were not accurate, truthful, complete, reasonable or
26   necessary-- as set forth herein.

27   **C.    CPT CODES**

28   74.    Effective January 1, 2007, the CPT book specifies as follows for the

1  primary CPT codes involved with Mohs surgery:

2      17311       Mohs micrographic technique, including removal of all gross
3                      tumor, surgical excision of tissue specimens, mapping, color
4                      coding of specimens, microscopic examination of specimens
5                      by the surgeon, and histopathologic preparation including
6                      routine stain(s) (e.g., hematoxylin and eosin, toluidine blue),
7                      head, neck, hands, feet, genitalia, or any location with surgery
8                      directly involving muscle, cartilage, bone, tendon, major
9                      nerves, or vessels; first stage, up to 5 tissue blocks.

10     17312       Mohs micrographic technique, including removal of all gross
11                     tumor, surgical excision of tissue specimens, mapping, color
12                     coding of specimens, microscopic examination of specimens
13                     by the surgeon, and histopathologic preparation including
14                     routine stain(s) (e.g., hematoxylin and eosin, toluidine blue),
15                     head, neck, hands, feet, genitalia, or any location with surgery
16                     directly involving muscle, cartilage, bone, tendon, major
17                     nerves, or vessels; each additional stage after the first stage, up
18                     to 5 tissue blocks (list separately in addition to code for
19                     primary procedure).

20     17313       Mohs micrographic technique, including removal of all gross
21                     tumor, surgical excision of tissue specimens, mapping, color
22                     coding of specimens, microscopic examination of specimens
23                     by the surgeon, and histopathologic preparation including
24                     routine stain(s) (e.g., hematoxylin and eosin, toluidine blue), of
25                     the trunk, arms, or legs; first stage, up to 5 tissue blocks.

26     17314       Mohs micrographic technique, including removal of all gross
27                     tumor, surgical excision of tissue specimens, mapping, color
28                     coding of specimens, microscopic examination of specimens

by the surgeon, and histopathologic preparation including routine stain(s) (e.g., hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; each additional stage after the first stage, up to 5 tissue blocks (list separately in addition to code for primary procedure).

17315    Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (e.g., hematoxylin and eosin, toluidine blue), each additional block after the first 5 tissue blocks, any stage (list separately in addition to code for primary procedure).

75. CPT Codes 17311-17315 are used for Mohs surgery when tumor selection criteria are met and the Mohs surgeon acts as surgeon and pathologist. If Mohs surgery is performed on the same day as the E/M services, a -25 modifier is to be used with the appropriate E/M code. If an unrelated major surgical procedure was performed in addition to the Mohs surgery, a - 57 would be attached to the E/M code instead of the -25.

76. As suggested above, the following surgical and laboratory procedures are bundled into the 17311-17315 codes: clinical evaluation of tumor margins, outlining of tumor margins with skin-marking pens, reference-mark placement, local anesthesia of the tumor area, "debulking" of the tumor, surgical excision of the first stage (layer, or level), division of the specimen into smaller sections (if done), chroma-coding of all sections, mapping, embedding, cutting, and staining of the histopathology slides, complete microscopic slide evaluation, and transfer of the histologic findings to the Mohs map.

77. If the margins of the first stage are clear of cancer, and if the defect will be allowed to heal by secondary intention, hemostasis, bandaging, and post-

1   operative instructions are also bundled with codes 17311-17315.

2   78.   The excision of the first layer of tissue may be totally embedded

3   ("TE") and processed as a single specimen ("Texl") or may be of a size or

4   complexity requiring division into multiple smaller sections.

5   79.   Dividing the specimen into five or fewer sections is bundled within

6   code 17311-17315.  No matter how many cuts are put on a slide or how many

7   slides are made, these are all bundled into code 17311-17315.

8   80.   When the specimen removed in the first stage, or any subsequent

9   stage, is so large and/or complex that it requires division into more than five

10  sections, for each additional stage, depending on the body area, 17312-17315 may

11  be applied.  H & E staining and/or toluidine blue staining are also bundled within

12  code 17311-17315, as noted above.

13  81.   If more than one separate tumor is appropriately treated using Mohs

14  excision on the same date of service, each tumor is billed separately using Mohs

15  codes 17311 through 17315.  If the stage one specimen is not clear of cancer, one

16  or more additional stages will need to be excise until clear margins are obtained.

17  These additional stages are coded as 17312 for the additional stage for the head,

18  neck, hands, feet, genitalia, or any area involving muscle, bone, nerves, vessels, or

19  cartilage; 17313 for the first stage for the trunk, arms or legs; 17314 for each

20  additional stage after stage one for the trunk, arms, or legs; and, 17315 each

21  additional block after the first five tissue blocks, any stage.

22  **D.   FRAUDULENTLY BILLING FOR MOHS**

23  82.   Pacific Dermatology has engaged in a scheme to defraud federal

24  healthcare programs wherein its surgeons bill for Mohs surgeries using the Mohs-

25  specific CPT codes despite the Mohs surgeon failing to perform the histologic

26  evaluation of the specimen.

27  83.   Specifically, Dr. Bradley Mudge of Pacific Dermatology performs

28  the excision portion of the Mohs micrographic surgical procedure but does not

1   also perform the histologic evaluation. Instead, Pacific Dermatology has Dr.

2   Khodadad Mehraein, a pathologist located in Tustin, California, interpret Dr.

3   Mudge's slides.

4       84.   Both Dr. Mudge and Dr. Mehraein have concealed Dr. Mehraein's

5   identity from certain of their co-workers.  Physician Assistants who have worked

6   with Dr. Mehraein have asked Dr. Mudge who he is, but Dr. Mudge has refused to

7   share.  Whenever Dr. Mehraein interprets Dr. Mudge's slides, he refrains from

8   talking or associating with anyone.  Despite this clandestine behavior, Dr.

9   Mehraein performs interpretive services for Dr. Mudge on a nearly full-time basis.

10      85.   Pacific Dermatology performs approximately seventeen (17) Mohs

11  surgeries per day.

12      86.   In 2017, Dr. Mudge submitted claims for the following Mohs-

13  specific CPT codes:  17311 and 17312.

14      87.   In 2017, Dr. Mudge submitted claims for CPT code 17311 no fewer

15  than 147 times for no fewer than 118 Medicare beneficiaries. For that year, the

16  Average Medicare Payment for CPT Code 17311 was $487.15.

17      88.   In 2017, Dr. Mudge submitted claims for CPT code 17312 no fewer

18  than 127 times for no fewer than 74 Medicare beneficiaries.  For that year, the

19  Average Medicare Payment for CPT Code 17312 was $316.99.

20      89.   By submitting claims to Medicare for Mohs-specific services without

21  performing the histologic evaluation portion, Pacific Dermatology has submitted

22  false claims for payment. The amounts received include reimbursement for

23  services Pacific Dermatology did not perform, thereby allowing Pacific

24  Dermatology to recoup amounts greater than if they had submitted claims with

25  general excision codes.

26      **E.   AKS VIOLATIONS**

27      90.   The claims for Mohs-specific services are made further false because

28  they are the product of kickbacks actionable under the Federal Anti-Kickback

1  Statute, 42 U.S.C. § 1320a-7b(b).

2      91.   The Anti-Kickback Statute prohibits anyone from knowingly and

3  willfully offering, providing, soliciting, or receiving remuneration to induce

4  referrals for items or services payable under federal healthcare programs.

5      92.   Here, Pacific Dermatology knowingly and willfully paid Dr.

6  Mehraein to perform interpretive services so that Pacific Dermatology could bill

7  using the Mohs-specific CPT codes (which command higher rates of

8  reimbursement) as opposed to general excision CPT codes.

9      93.   Pacific Dermatology in fact billed Medicare for these services, as

10  detailed above.

11      94.   But for the payments to Pacific Dermatology paid to Dr. Mehraein,

12  the interpretive services would not have been furnished by Dr. Mehraein.

13      95.   Both Dr. Mudge's and Dr. Mehraein's unwillingness to reveal the

14  identity of the pathologist performing the interpretive services indicates their

15  collective understanding that the scheme employed involves an arrangement

16  actionable under the Anti-Kickback Statute and that any ensuing claims submitted

17  are actionable under the False Claims Act.

18      **F.   PHYSICIAN ASSISTANT SUPERVISION VIOLATIONS**

19      96.   The Medicare program allows physician assistants ("PAs") to submit

20  claims for payment under the PA's National Provider Identifier ("NPI") number

21  for certain covered services.  Covered services are limited to the services a PA is

22  legally authorized to perform in accordance with State law (or State regulatory

23  mechanism provided by State law).

24      97.   The services of a PA may be covered under Medicare Part B only if,

25  *inter alia*, the PA "[p]erforms the services in accordance with state law and state

26  scope of practice rules for physician assistants in the state in which the physician

27  assistant's professional services are furnished.  Any state laws and scope of

28  practice rules that describe the required practice relationship between physicians

1    and physician assistants, including explicit supervisory or collaborative practice

2    requirements, describe a form of supervision for purposes of section

3    1861(s)(2)(K)(i) of the Act." 42 C.F.R. § 410.74(a)(2)(iv).

4        98.    For assistant-at-surgery service performed by a physician assistant,

5    Medicare pays 65 percent of the amount allowed under the physician fee

6    schedule. 42 C.F.R. § 414.52(a). For services other than assistant-at-surgery

7    services furnished in a hospital by a physician assistant, Medicare pays 75 percent

8    of the physician fee schedule amount for the service. 42 C.F.R. § 414.52(b). For

9    all other services performed by a physician assistant, Medicare pays 85 percent of

10    the physician fee schedule amount for the service. 42 C.F.R. §414.52(c).

11        99.    All PAs employed by Pacific Dermatology practice in the State of

12    California. Accordingly, for the services performed by Pacific Dermatology's

13    PAs to be covered under Medicare, the PAs must satisfy and adhere to

14    California's state law governing PAs and their scope of practice.

15        100.    The California Medical Practice Act limits the number of PAs a

16    physician may supervise to four (4). *See* Bus. & Prof. Code § 3516(b).

17        101.    Pacific Dermatology is in violation of California law with regard to

18    the number of PAs that its physicians supervise. Pacific Dermatology has tasked

19    one physician, Dr. Katrina Woodhall, to supervise twelve (12) PAs. Dr. Woodhall

20    has expressed her frustration with this arrangement, but Pacific Dermatology

21    continues to place supervision responsibilities with her. As California law limits

22    the number of PAs that may be supervised by a physician to four (4), the services

23    furnished by those PAs are not covered by Medicare Part B because the PA is not

24    performing those services in accordance with state law.

25        102.    Despite failing to adhere to California's statutory limitation on the

26    number of PAs a supervision may supervise, Pacific Dermatology submitted

27    claims to Medicare and Medicaid under its PA's NPIs. For instance, in 2017, Ms.

28    Laura Wooley, PA-C, submitted no fewer than thirty-one (31) claims for CPT

1  Code 11100 for no fewer than 31 Medicare beneficiaries; no fewer than nineteen
2  (19) claims for CPT Code 11300 for no fewer than eighteen (18) Medicare
3  beneficiaries; no fewer than twenty-two (22) claims for CPT Code 11301 for no
4  fewer than eighteen (18) Medicare beneficiaries; no fewer than sixteen (16)
5  claims for CPT Code 11305 for no fewer than fifteen (15) Medicare beneficiaries;
6  no fewer than thirty (30) claims for CPT code 11310 for no fewer than twenty-six
7  (26) Medicare beneficiaries; no fewer than twenty-two (22) claims for CPT code
8  11311 for no fewer than twenty-one (21) Medicare beneficiaries; no fewer than
9  174 claims for CPT Code 17000 for no fewer than 159 Medicare beneficiaries; no
10 fewer than 661 claims for CPT Code 17003 for no fewer than 126 Medicare
11 beneficiaries; no fewer than ninety (90) claims for CPT Code 17004 for no fewer
12 than eighty-four (84) Medicare beneficiaries; no fewer than 146 claims for CPT
13 Code 17110 for no fewer than 135 Medicare beneficiaries; no fewer than thirteen
14 (13) claims for CPT Code 17111 for no fewer than twelve (12) Medicare
15 beneficiaries; no fewer than fourteen (14) claims for CPT Code 29580 for no
16 fewer than thirteen (13) Medicare beneficiaries; no fewer than thirty-seven (37)
17 claims for CPT Code 96372 for no fewer than thirty-two (32) Medicare
18 beneficiaries; no fewer than thirty (30) claims for CPT Code 99202 for no fewer
19 than thirty (30) Medicare beneficiaries; no fewer than sixty-six (66) claims for
20 CPT Code 99203 for no fewer than sixty-six (66) Medicare beneficiaries; no
21 fewer than ninety-five (95) claims for CPT Code 99212 for no fewer than eighty-
22 two (82) Medicare beneficiaries; no fewer than 351 claims for CPT Code 99213
23 for no fewer than 294 Medicare beneficiaries; no fewer than seventy-eight (78)
24 claims for CPT Code 99214 for no fewer than seventy-seven (77) Medicare
25 beneficiaries; no fewer than thirty-four (34) claims for CPT Code J1100 for no
26 fewer than twenty-nine (29) Medicare beneficiaries; and no fewer than 153 claims
27 for CPT Code J3301 for no fewer than forty (40) Medicare beneficiaries.
28 ///

### G.   CLIA LICENSING AND LOCATION ISSUES

103.   Section 353 of the Public Health Service Act, as amended by the Clinical Laboratory Improvement Act of 1988 ("CLIA"), requires all laboratories that perform tests on human specimens to meet the requirements established by Congress.  Moreover, all clinical laboratories must be properly certified to receive Medicare or Medicaid payments.

104.   Among the CLIA requirements are those for personnel for nonwaived testing.  42 C.F.R. 493.1351.

105.   In order for a laboratory, including physician office laboratories, to offer moderate or complex testing, the laboratory must employ a licensed lab director.  The HCPCS codes for Mohs include the physician's microscopic examination and interpretation of tissue specimens.  Both the microscopic examination and interpretation of tissue specimens are categorized as high complexity tests under CLIA in the specialty of histopathology. Accordingly, CLIA requires a lab director for every laboratory where such examinations and interpretations occur.

106.   A lab director may direct no more than five (5) laboratories. 42 C.F.R. 493.1445(d).

107.   At various times, Pacific Dermatology has employed only one individual who possesses a CLIA lab director license: Dr. Katrina Woodhall. Against her wishes, Pacific Dermatology uses Dr. Woodhall's license so that other physicians, including Dr. Bradley Mudge, can perform Mohs surgeries without having to obtain a CLIA lab director license.  While only one lab director is required per laboratory, Dr. Woodhall is unable to both practice dermatology and supervise her colleagues' Mohs procedures. Nonetheless, Pacific Dermatology physicians refuse to obtain the requisite licensure and abuse Dr. Woodhall's license for their own gain.

108.   Upon information and belief, Pacific Dermatology performs Mohs

1    surgeries (including the evaluation and interpretation) at all eleven (11) of its
2    office locations. As a lab director may direct at most five (5) laboratories, Pacific
3    Dermatology is in violation of the CLIA regulations.  Nonetheless, it continues to
4    submit claims for Mohs to Medicare and Medicaid.

5        109.  Every other year, a Mohs surgeon must residence, and
6    this relicensing involves documentation of the Mohs surgeon reading two test
7    slides with an independent pathologist to verify their performance.

8        110.  Upon information and belief, Dr. Bradley Mudge has not completed
9    the relicensing requirements.

10       111.  Additionally, Pacific Dermatology inappropriately submits claims for
11   payment without disclosing the appropriate CLIA licensing location.

12       112.  When submitting a claim for payment, each claim requires a CLIA
13   license ID.  Moreover, in California, each physical location (address) where the
14   Mohs procedure is done requires its own unique CLIA license.

15       113.  Pacific Dermatology submits claims for payment under a single
16   CLIA license ID (CLIA #05D2166472) despite providing Mohs surgeries across
17   all of its locations.

18                      **FIRST CAUSE OF ACTION**
19                      **(False or Fraudulent Claims)**
20                   **(FCA 31 U.S.C. § 3729(a)(1)(A))**
21                   **(Cal. Govt. Code § 12651 *et seq.*)**

22       114.  Relator hereby incorporates and re-alleges all other paragraphs as if
23   fully set forth herein.

24       115.  As set forth above, Defendants, by and through their agents, officers,
25   and employees, knowingly presented, or caused to be presented to the United
26   States Government and the State of California numerous false or fraudulent
27   claims for payment or approval, in violation of the FCA, 31 U.S.C. §
28   3729(a)(1)(A) and/or the California False Claims Act, Cal. Govt. Code § 12651 *et*

1  │ *seq.*

2  │     116.   Due to Defendants' conduct, the United States and the State of

3  │ California have suffered substantial damages.

4  │     117.   The United States and the State of California are entitled to treble

5  │ damages based upon the amount of damage sustained by them in an amount that

6  │ will be proven at trial.

7  │     118.   The United States and the State of California are entitled to the

8  │ largest civil penalty allowed by law for each of the false claims.

9  │     119.   Relator is also entitled to her attorney's fees and litigation expenses.

10 │ **SECOND CAUSE OF ACTION**

11 │ **(False Statements)**

12 │ **(FCA 31 U.S.C. § 3729(a)(1)(B))**

13 │ **(Cal. Govt. Code § 12651 *et seq.*)**

14 │     120.   Relator hereby incorporates and re-alleges all other paragraphs as if

15 │ fully set forth herein.

16 │     121.   As set forth above, Defendants, by and through their agents, officers

17 │ and employees, knowingly made, used, or caused to be made or used, a false

18 │ record or statement material to a false or fraudulent claim, in violation of the

19 │ FCA, 31 U.S.C. § 3729(a)(1)(B) and/or the California False Claims Act, Cal.

20 │ Govt. Code § 12651 *et seq.*

21 │     122.   Due to Defendants' conduct, the United States and the State of

22 │ California have suffered substantial damages.

23 │     123.   The United States and the State of California are entitled to treble

24 │ damages based upon the amount of damage sustained by them in an amount that

25 │ will be proven at trial.

26 │     124.   The United States and the State of California are entitled to the

27 │ largest civil penalty allowed by law for each of the false claims.

28 │     125.   Relator is also entitled to her attorney's fees and litigation expenses.

**THIRD CAUSE OF ACTION**

**(Failure to Repay)**

**(FCA-31 U.S.C. § 3729(a)(1)(G))**

**(Cal. Govt. Code § 12651 *et seq.*)**

126.   Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

127.   As set forth above, Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the United States Government and the State of California and  knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property or money to the United States Government and the State of California, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G) and/or the California False Claims Act, Cal. Govt. Code § 12651 *et seq.*

128.   Due to Defendants' conduct, the United States and the State of California have suffered substantial damages.

129.   The United States and the State of California are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

130.   The United States and the State of California are entitled to the largest civil penalty allowed by law for each of the false claims.

131.   Relator is also entitled to her attorney's fees and litigation expenses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relator prays for judgment:

a.      awarding the United States and the State of California damages sustained by them for each of the false claims;

b.      awarding the United States and the State of California treble damages sustained by them for each of the false claims;

1   c.  awarding the United States and the State of California the largest

2 civil penalty allowed by law for each of the false claims;

3   d.  awarding Relator 30% of the proceeds of this action and any alternate

4 remedy or the settlement of any such claim;

5   e.  awarding Relator her litigation costs and reasonable attorney's fees;

6 and

7   f.  granting such other relief as the Court may deem just and proper.

8

9 DATED: September 4, 2020  SCHONBRUN SEPLOW HARRIS
                 HOFFMAN & ZELDES LLP

10             BOTHWELL LAW GROUP, P.C.

11

12         By:

13             Wilmer J. Harris
             Mike Bothwell

14             Attorneys for Relator/Plaintiff,
             Randy Jacobs

15

16

17          **JURY DEMAND**

18   Plaintiff hereby demands a jury trial on all issues triable to a jury.

19 DATED: September 4, 2020  SCHONBRUN SEPLOW HARRIS
20             HOFFMAN & ZELDES LLP

21             BOTHWELL LAW GROUP, P.C.

22

23         By:

24             Wilmer J. Harris
             Mike Bothwell

25             Attorneys for Relator/Plaintiff, Randy
             Jacobs

26

27

28

